UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PAMELA PATEL,

     Plaintiff,

v.                              Case No. 8:24-cv-01886-WFJ-AAS

BAYCARE HEALTH SYSTEM, INC.,

     Defendant.
_____/

## ORDER

Before the Court is Defendant BayCare Health System, Inc.'s ("BayCare") Motion for Summary Judgment. Dkt. 58. Plaintiff Pamela Patel ("Patel") has responded in opposition, Dkt. 71, and BayCare has replied. Dkt. 79. On April 1, 2026, the Court held a motion hearing on this matter. Dkt. 84. Upon careful consideration, and with the benefit of able argument by both sides, the Court finds that summary judgment is due to be granted as to all counts.

## BACKGROUND

### I.   Plaintiff's Position and Employment

On April 11, 2022, BayCare hired Ms. Patel as Executive Assistant to the Hospital President, Becky Schulkowski, and three other C-Suite Executives—the Chief Medical Officer, the Director of Operations, and the Director of Patient

1

Services—at the newly constructed BayCare Hospital Wesley Chapel ("the Hospital"). Dkt. 60 46:7-18; Dkt. 72 ¶ 1; Dkt. 72-1. Schulkowski was Patel's direct supervisor, though Patel provided some assistance to the other Executives. Dkt. 59 ¶ 3; Dkt. 71-2 ¶ 3.

At the time of Ms. Patel's hire, the Hospital was still under construction. Dkt. 59 ¶ 5; Dkt. 71-2 ¶ 5. During that pre-opening period, Patel and the Executives worked from temporary offices at the BayCare Integrated Service Center ("BISC") in Temple Terrace, where at least one other Executive Assistant was also on staff. Dkt. 59 ¶ 6; Dkt. 71-2 ¶ 6. While at the BISC, Patel performed a relatively limited set of duties—scheduling, call routing, mail distribution, document organization, supply ordering, meeting coordination, and related administrative tasks—and worked from home one to two days per week. Dkt. 59 ¶¶ 7, 9; Dkt. 71-2 ¶¶ 7, 9; *see also* Dkt. 60-1 at 1 (showing BayCare's "Job Description" for the executive assistant role). Before the Hospital's opening, BayCare asserts that it was repeatedly communicated in staff meetings that, upon relocation to the Hospital, all administrative executives and staff, including Patel, were expected to work in person and on-site. Dkt. 59 ¶ 10. Plaintiff claims she was never informed of such expectations in staff meetings. Dkt. 71-2 ¶ 10.

On December 20, 2022, Hospital leadership and staff moved into the Administration Suite at the new Hospital. Dkt. 59 ¶ 13; Dkt. 71-2 ¶ 13. While there

2

may have been other administrative support employees in the Hospital, Patel's position was the only assistant role for the C-Suite executives. Dkt. 59 ¶ 14; Dkt. 71-2 ¶ 14.

With the move to the Hospital, Patel's responsibilities changed. Dkt. 59 ¶ 17; Dkt. 71-2 ¶ 17. BayCare asserts Patel's new duties now involved: serving as the receptionist of the Administration Suite; ensuring no unauthorized visitors passed into Executive offices (which she described as the "biggest part" of her job); greeting and escorting visitors from Guest Services to the Administration Suite; managing Schulkowski's calendar and serving as a daily sounding board; answering and routing calls; receiving and distributing mail; managing conference room reservations and setting up all audio/visual equipment; preparing Board Books and printed materials for Board meetings; attending Board meetings and recording minutes; filing, printing, and shredding documents; ordering supplies; and performing other tasks as assigned. Dkt. 59 ¶¶ 18–23; Dkt. 71-2 ¶¶ 18–23.

Patel testified that she sometimes needed to be in person "to get things done," since Schulkowski's responsiveness to emails was variable. Dkt. 59 ¶¶ 26–27; Dkt. 71-2 ¶¶ 26–27. Once the Hospital opened, she occasionally worked remotely on Fridays but was otherwise in-person Monday through Friday. Dkt. 59 ¶¶ 28, 30; Dkt. 71-2 ¶¶ 28, 30. The Hospital opened to patients on March 7, 2023. Dkt. 59 ¶ 37; Dkt. 71-2 ¶ 37.

## II.    Plaintiff's FMLA Leave and Extensions

Ms. Patel began maternity leave on March 14, 2023, the same day she gave birth. Dkt. 59 ¶¶ 39, 43; Dkt. 71-2 ¶¶ 39, 43. Because she had not yet satisfied the twelve-month eligibility requirement for FMLA leave at that time, Plaintiff had been approved for continuous Company Medical Leave from March 14, 2023, through May 1, 2023, as a bridge. Dkt. 59 ¶ 50; Dkt. 71-2 ¶ 50. On May 2, 2023, Patel became FMLA-eligible and was approved for twelve weeks of FMLA leave, running from May 2, 2023, through July 24, 2023—her full statutory entitlement. Dkt. 59 ¶ 54; Dkt. 71-2 ¶ 54. Upon exhaustion of her FMLA leave, additional Company Medical Leave was approved for Patel through August 1, 2023, resulting in a total of 20 weeks of approved leave following the birth of her child. Dkt. 59 ¶ 57; Dkt. 71-2 ¶ 57.

On July 18, 2023, before her leave ended, Patel emailed Schulkowski requesting flexible scheduling and remote work, indicating she anticipated needing these accommodations until at least April 5, 2024—more than a year after her child's birth and approximately eight additional months beyond her scheduled return date. Dkt. 59 ¶ 59; Dkt. 71-2 ¶ 59. In the email, Patel cited dehydration, fatigue, back pain, delayed childbirth recovery, postpartum depression, separation anxiety, and concerns about exposure to pathogens and off-gassed toxins at the new hospital facility. Dkt. 59 ¶ 60; Dkt. 71-2 ¶ 60; *see* Dkt. 60-11 at 2 (showing Plaintiff's email).

4

Consistent with BayCare policy, Patel was provided a "BayCare Employee Health Work Clearance Form" for her OB-GYN physician to complete. Dkt. 59 ¶ 61; Dkt. 71-2 ¶ 61; Dkt. 60-14 (showing Work Clearance Form). On July 20, 2023, the doctor completed the form, circling "No" to the question of whether Ms. Patel had "a physical or mental impairment that limits [her] ability to perform an essential function of [her] job," and identified no physical, environmental, or other restrictions or limitations. Dkt. 60-14; Dkt. 71-2 ¶ 62. The doctor's sole notation stated: "If patient can work from home, she will be able to perform her duties as expected," with the end date of these restrictions being "uncertain." Dkt. 60-14; Dkt. 71-2 ¶ 63. The doctor later testified that, at the time she completed the form, she was unaware of Patel's specific job duties or whether those duties could be performed remotely; instead, she was merely supporting Patel's preference to work from home. Dkt. 59 ¶¶ 64–65; Dkt. 71-2 ¶¶ 64–65.

### III. The Interactive Process

On July 25, 2023, BayCare's Team Member Relations Coordinator, Joi Daniel, notified Patel that her request to work remotely in her Executive Assistant role could not be accommodated. Dkt. 59 ¶ 70; Dkt. 71-2 ¶ 70. The parties then agreed to virtually meet on August 3, 2023, to engage in the interactive process and further discuss Patel's options. Dkt. 59 ¶¶ 72–73; Dkt. 71-2 ¶¶ 72–73.

On August 3, 2023, Sheila Redfearn, Director of Team Resources, and Joi Daniel held a videoconference with Patel and her husband to discuss accommodation options. Dkt. 59 ¶ 80; Dkt. 71-2 ¶ 80. During that meeting, Patel shared a list of suggested accommodations she and her husband had prepared, including requests for a reverse osmosis water filter system,[1] monthly water testing, IQ Air HealthPro Plus GC air filtration in all areas of the Hospital, a closed-door private office with UV and HyperHEPA filtration systems, monthly testing of all air filtration equipment, a massage chair, and other items. Dkt. 59 ¶¶ 83–84; Dkt. 71-2 ¶¶ 83–84; *see* Dkt. 60-21 at 1 (showing copy of Plaintiff's requests).

BayCare understood that these were additional accommodations Ms. Patel required to return to in-person work at the Hospital. Dkt. 59 ¶ 85. However, Patel admitted during her deposition that she did not know what many of the items were, what EWG standards or PFAS are, or which chemicals would be off-gassed by the building. Dkt. 59 ¶ 88; Dkt. 71-2 ¶ 88. No physician recommended all of these suggested accommodations. Dkt. 59 ¶¶ 91–92; Dkt. 71-2 ¶¶ 91–92. Ms. Patel's husband, a preconstruction manager, helped prepare the list. Dkt. 59 ¶ 88; Dkt. 71-2 ¶ 88.

---

[1] Specifically, Plaintiff preferred the "RO water to ensure toxins, PFAS, pesticides, and excessive minerals in Pasco County water are removed and comply with EWG standards. Hardness to be 75ppm or less. Monthly testing by 3rd party to ensure compliance with EWG standards and maintenance per the manufacturer['s] suggested schedule." Dkt. 60-21.

6

On August 8, 2023, Sheila Redfearn sent Patel a detailed letter explaining BayCare's accommodation position and enclosing a medical questionnaire for her physician, asking the physician to identify (i) whether each requested accommodation was necessitated by a specific physical or psychological limitation; (ii) whether the limitation affected Patel's ability to perform the essential functions of her job; (iii) how the accommodation would help her perform those functions; and (iv) the expected duration. Dkt. 59 ¶¶ 99–100; Dkt. 71-2 ¶¶ 99–100. Patel never provided the questionnaire to her doctor and never authorized BayCare to contact her doctor directly. Dkt. 59 ¶ 92; Dkt. 71-2 ¶ 92.

Throughout the interactive process, BayCare agreed to accommodate some of Ms. Patel's suggestions, including pump breaks, additional bathroom breaks, flexible scheduling for doctor and therapy appointments, and the ability to bring and drink her own water. Dkt. 59 ¶ 101; Dkt. 71-2 ¶ 101; Dkt. 60-21. On August 18, 2023, BayCare also offered Patel the services of a Placement Coordinator to assist in finding a remote or in-person position at another facility and to accommodate her scheduling needs in any such position. Dkt. 59 ¶ 106; Dkt. 71-2 ¶ 106. The Placement Coordinator contacted Patel on August 21, 2023. Dkt. 59 ¶ 107; Dkt. 71-2 ¶ 107. That same day, Ms. Patel rejected the Placement Coordinator's assistance. Dkt. 59 ¶¶ 108–109; Dkt. 71-2 ¶¶ 108–109.

7

Patel never returned to work in person. Dkt. 60-36. By September 18, 2023, BayCare had hired a temporary employee to fill the Executive Assistant position. Dkt. 59 ¶ 116; Dkt. 71-2 ¶ 116. On September 22, 2023, seven months after the child's birth and more than seven weeks after Patel's FMLA leave had exhausted, BayCare terminated her employment. Dkt. 59 ¶ 120; Dkt. 71-2 ¶ 120.

## IV.    Procedural History

On August 11, 2024, Ms. Patel filed suit against BayCare. Dkt. 1. In her Amended Complaint, Plaintiff alleges ten counts against Defendants: a Fair Labor Standards Act claim, Count I; Family and Medical Leave Act ("FMLA") claims for interference and retaliation, Counts II and III; Pregnant Workers Fairness Act ("PWFA") claims for failure to accommodate, retaliation, and interference, Counts IV–VI; and Pregnancy Discrimination Act ("PDA") claims for retaliation, retaliatory hostile work environment, and discrimination, Counts VII–X.[2] *See* Dkt. 32. On January 30, 2026, Defendant filed the instant motion for summary judgment on Counts II–X. *See* Dkt. 58.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a).

---

[2] Count I is not before the Court on summary judgment, as the parties have settled this claim. *See* Dkt. 37.

8

An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The court may not weigh the evidence to resolve a factual dispute; if a genuine issue of material fact exists, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed

facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Additionally, a district court is only required to consider "the cited materials" when deciding a motion for summary judgment, Fed. R. Civ. P. 56(c)(3), and "[m]aking district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).

## DISCUSSION

Based on a careful review of the record, the Court finds that BayCare is entitled to summary judgment on all counts because there is no genuine dispute that BayCare complied with federal law before terminating Plaintiff's employment. This Order will address each one of Plaintiff's counts in turn.

## I.    FMLA Claims (Counts II and III)

The FMLA allows employees to take leave for certain medical reasons under 29 U.S.C. §§ 2601 and 2612. For these reasons, an eligible employee may take up to 12 weeks of leave due to a serious health condition that renders her unable to perform the functions of her position. *Id.* § 2612(a)(1)(D). Upon return from FMLA leave, the statute also guarantees an eligible employee the right to be restored to her former position or an equivalent position at the end of her leave, provided she can perform the essential functions of her job. *See id.* § 2614(a)(1). "But if, after twelve weeks, the employee cannot perform an essential function of her job, her employer may choose to end her employment." *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1241 (11th Cir. 2021) (citing 29 C.F.R. § 825.216(c)).

To ensure these FMLA rights are enforced, the statute "creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . , and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (citation modified).

### a.  FMLA Interference Claim—Count II

"Under the FMLA, a covered employer may not interfere with, restrain, or deny the employee's exercise or attempted exercise of her FMLA rights to coverage,

leave entitlement, notice, benefits continuation, and job restoration." *Ramji*, 992 F.3d at 1241 (citing 29 U.S.C. § 2615(a)(1); 29 U.S.C. §§ 2601–2654; 29 C.F.R. §§ 825.100–825.803). "To establish an FMLA interference claim, an employee must show she was entitled to a benefit under the FMLA and her employer denied her that benefit." *Id.* (citation omitted). Once Plaintiff has shown a denial of a benefit, "the employee must also demonstrate some harm from the alleged interference, and that harm must be remediable by either damages or equitable relief." *Id.* (citation modified). An employee establishes an FMLA interference claim when the employee "demonstrate[s] by a preponderance of the evidence that she was entitled to an FMLA benefit that was denied." *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018)

"Unlike retaliation claims, a plaintiff bringing an interference claim is not required to make any showing regarding the employer's motives." *Lapham v. Walgreen Co.*, 88 F.4th 879, 896 (11th Cir. 2023) (citation omitted). Where, as is the case here, "the alleged interference was the decision to terminate an employee, . . . the employer may defend against an FMLA interference claim by establishing that the employee would have been terminated anyway." *Id.* (citation modified); *see also Spakes v. Broward Cnty. Sheriff's Off.*, 631 F.3d 1307, 1310 (11th Cir. 2011) ("If an employer demonstrates that it would have discharged an employee for a reason

12

wholly unrelated to the FMLA leave, the employer is not liable under the FMLA for damages for failure to reinstate." (citation modified)).

As an initial matter, there is no dispute that Patel's childbirth entitled her to 12 weeks of FMLA leave and that she received all 12 weeks. First, the record shows that Patel did not yet qualify for FMLA leave at the time of her child's birth on March 14, 2023, so she was granted nearly seven weeks of "Company Medical Leave" as a bridge to FMLA eligibility on May 2, 2023. *See* Dkt. 59 ¶¶ 43, 50, 54; Dkt. 71-2 ¶¶ 43, 50, 54. Second, once Plaintiff began FMLA leave on May 2, 2023, Plaintiff was approved for 12 weeks of FMLA leave, until July 24, 2023. Dkt. 59 ¶ 54; Dkt. 71-2 ¶ 54. Third, once the FMLA leave ended, additional "Company Medical Leave" was provided to Plaintiff as an extension, from July 25, 2023, to August 1, 2023. Dkt. 59 ¶¶ 54–57; Dkt. 71-2 ¶¶ 54–57.

Plaintiff, however, argues that BayCare interfered with her "reinstatement rights" upon the end of her FMLA leave. Dkt. 71 at 4. The problem for Patel is that the Eleventh Circuit has already found that an employer need not reinstate an employee who takes additional leave after exhausting her FMLA leave. *See Jones*, 854 F.3d at 1268 ("Relevant caselaw suggests that an employer does not interfere with an employee's right to reinstatement if that employee is terminated after taking leave in excess of the 12 weeks permitted by the FMLA."). Indeed, "[t]he FMLA 'provides for only 12 weeks of leave' and 'does not suggest that the 12 week

13

entitlement may be extended.'" *Id.* at 1267 (quoting *McGregor v. AutoZone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999)).

Here, the undisputed record shows that Plaintiff had exhausted her FMLA leave and then received additional non-FMLA leave. Dkt. 59 ¶¶ 54–57. The fact that Redfearn called the additional "Company Medical Leave" time FMLA leave, Dkt. 71-2 ¶ 56; Dkt. 60-16 (showing Redfearn's email to Patel on July 27, 2023), does not extend the statute's fixed 12-week entitlement. *See Meade v. Gen. Motors LLC*, 317 F. Supp. 3d 1259, 1279 (N.D. Ga. 2018) ("[T]he fact that Defendant granted Plaintiff additional unpaid leave – and even called it FMLA leave – cannot extend the statute's fixed entitlement of 12 weeks."). Patel cannot prevail on her FMLA interference claim, as she was not entitled to reinstatement "after taking leave in excess of the 12 weeks permitted by the FMLA." *Jones*, 854 F.3d at 1268; *see Penaloza v. Target Corp.*, 549 F. App'x 844, 848 (11th Cir. 2013) ("As to interference, Target gave Ms. Penaloza over 12 weeks of leave before her termination. She was terminated two weeks after her 12–week leave period ended. Thus, Penaloza cannot show that she was denied any benefit to which she was entitled under the FMLA."); *Giles v. Daytona State Coll., Inc.*, 542 F. App'x 869, 874–75 (11th Cir. 2013) ("[T]he district court properly granted summary judgment to Daytona State on Giles's FMLA interference claim. The record confirms that Giles used all of her available FMLA leave on June 22, 2009, and thus, there is no

14

evidence that she was denied an FMLA benefit to which she was entitled."). Put simply, when BayCare exceeded the baseline 12 weeks by providing more leave than what the FMLA requires, Defendant "should not find itself sued for violating FMLA." *McGregor*, 180 F.3d at 1308 ("Because . . . plaintiff was absent for more than the protected period of time, she did not have a right to be restored to her prior or similar position.").

To the extent Plaintiff claims that her FMLA interference claim is grounded in BayCare's "refusal to provide a reasonable accommodation," Dkt. 71 at 4, the FMLA does not entitle employees to accommodations. "The FMLA leave provisions are 'wholly distinct' from the reasonable accommodation employers are obligated to provide under the Americans with Disabilities Act." *Yoosun Han v. Emory Univ.*, 658 F. App'x 543, 547 (11th Cir. 2016) (citing 29 C.F.R. § 825.702(a)). Because BayCare undisputedly provided 12 weeks of leave, plus an additional non-FMLA extension, Patel cannot show that she was denied any benefit to which she was entitled under the FMLA. The Court grants summary judgment on the FMLA interference claim in Count II.

### b. FMLA Retaliation Claim—Count III

Next, the Court considers Plaintiff's FMLA retaliation claim in Count III. Where, as is the case here, the plaintiff fails to provide direct evidence of retaliatory and discriminatory animus, a court can analyze an "FMLA retaliation claim under

15

the same burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973)." *McAlpin v. Sneads*, 61 F.4th 916, 927 (11th Cir. 2023) (citations omitted). Under the *McDonnell Douglas* burden shifting framework, "the plaintiff bears the initial burden of proving his prima facie case." *Id.* (citation omitted). "If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate reason for the adverse action." *Id.* (citation modified). "If the defendant can do so, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason is merely [a] pretext for prohibited, retaliatory conduct." *Id.* (citation modified).

To establish a prima facie case for FMLA retaliation, a plaintiff must show that "(1) she engaged in statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010) (citation omitted). BayCare concedes that Patel's medical leave for childbirth qualifies as protected activity under the FMLA. Dkt. 58 at 9–10. And, there is no dispute that Patel's termination satisfies the second prong of an FMLA prima facie case. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("[T]ermination is certainly an adverse employment action"). As such,

16

the Court focuses its analysis on the third prong—the causal connection between the two.

As to the causal connection requirement, "the plaintiff must prove only that the protected activity and the negative employment action are not completely unrelated." *McAlpin*, 61 F.4th at 932 (citation modified). "While the burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action, mere temporal proximity, without more, must be very close." *Id.* (citation modified). The relevant causation period is "measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Jones*, 854 F.3d at 1272. Additionally, the Eleventh Circuit has held that "the proper causation standard for FMLA . . . retaliation claims is but-for causation." *Lapham*, 88 F.4th at 893; *see also id.* at 894 ("For purposes of *McDonnell Douglas*, this but-for standard demarcates the causation component of the employee's initial, prima facie showing requirement and also shapes the subsequent burdens of both the employer (i.e., to proffer a legitimate reason sufficient to justify the termination) and the employee (i.e., to show that the reason proffered by the employer is pretextual).").

Here, the relevant period begins on Patel's last day of FMLA leave, July 24, 2023, and ends on her termination on September 22, 2023. Dkt. 59 ¶¶ 56, 120. This close temporal proximity between the FMLA leave and her termination—just under

17

two months—is sufficient to show a causal connection. *Cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (noting a three-to-four-month disparity is not enough for temporal proximity). As a result, the burden now shifts to BayCare to "proffer a legitimate, non-retaliatory reason for the adverse employment action." *McAlpin*, 61 F.4th at 932 (citation modified).

BayCare argues that it terminated Patel's employment not because she took FMLA leave, but because "she had not returned to work [after the FMLA leave exhausted], she was not cooperating with BayCare's attempts to evaluate her need for accommodations, including by refusing to obtain clarification from her doctor regarding her limitations and requested accommodations, she did not seek additional leave, and she rejected the Placement Coordinator." Dkt. 58 at 10. The record evidence supports these legitimate, non-retaliatory reasons, as documentation shows that BayCare was not uncooperative and sent at least 11 separate communications to Patel in an effort to find a workable accommodation. *See* Dkt. 60 at 223:18-224:8, 243:23-244:5, 251:12-252:23; Dkt. 60-13; Dkt. 60-16; Dkt. 60-17; Dkt. 60-20; Dkt. 60-22; Dkt. 60-23; Dkt. 60-25; Dkt. 60-27; Dkt. 60-29; Dkt. 60-31; Dkt. 60-33; Dkt. 73-11. These communications also included a request from BayCare for Ms. Patel to reach out to her doctor and have her physician complete a questionnaire specifying the accommodations necessary for Plaintiff to perform her job. *See* Dkt. 60-22 at 1, 13–25.

A plaintiff's refusal to comply with a defendant's request to fill out paperwork and an extended absence from work can be legitimate, nondiscriminatory reasons to terminate the plaintiff's employment. *See Agee v. Mercedes-Benz U.S. Int'l, Inc.*, 646 F. App'x 870, 876 (11th Cir. 2016) ("Plaintiff repeatedly refused to comply with Defendant's request that she fill out the FMLA paperwork. She was asked to supply more information about the nature of her restrictions so Defendant could try to work out an accommodation, but she failed to do so. . . . But Plaintiff was absent from work for several weeks without an excuse, so Defendant had a legitimate, nondiscriminatory reason to terminate her employment."); *see also Owens v. Governor's Office of Student Achievement*, No. 1:19-CV-5683-MHC-LTW, 2021 WL 4286460, at *8 (N.D. Ga. Sept. 17, 2021) (finding "Plaintiff failed to submit any additional documentation for weeks, and she refused to return to the office" as a legitimate, nondiscriminatory reason for termination), *aff'd*, 52 F.4th 1327 (11th Cir. 2022). Thus, the Court finds BayCare has provided a legitimate, non-retaliatory reason for Plaintiff's termination.

Because BayCare has met its burden to proffer a legitimate, nonretaliatory reason, the burden shifts back to Patel to establish that the reasons proffered by BayCare were "false and merely a pretext for h[er] termination." *McAlpin*, 61 F.4th at 932 (citation omitted). "A plaintiff can show pretext by demonstrating 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

19

the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Id.* (quoting *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021)).

Assuming Patel established a prima facie case on her FMLA retaliation claim, the Court finds she failed to prove that BayCare's proffered reasons were pretextual. While Plaintiff's response to the summary judgment is somewhat difficult to parse, she seems to make two arguments about pretext. First, Plaintiff claims the "inconsistent application of BayCare's accommodation policies as additional circumstantial evidence of discrimination, as well as pretext." Dkt. 71 at 18. Second, Plaintiff points to "BayCare's insistence that Patel confer with a placement coordinator was disingenuous and pretext for her termination[,] [since] [t]here was no viable position available for Patel at BayCare." *Id.* at 8. Neither of these arguments creates a genuine dispute of material fact.

Beginning with the inconsistent applications of BayCare's policies, Plaintiff points to three policies that required Defendant to explore remote work accommodations in good faith—"Policy #105, accommodation of persons with disabilities; BayCare Policy #430, accommodation of pregnant and postpartum workers; BayCare Policy #603, personal leave of absence." *Id.* at 12 (citing Dkts. 73-2, 73-3, 73-4). But Plaintiff never explains how BayCare applied these policies inconsistently. Instead, Plaintiff cites these three ADA, PWFA, and FMLA policies

and then summarily concludes "[d]enying Patel remote work as an accommodation despite the existence of multiple policies accommodating nonpregnant, pregnant, and post-partum employees suggests that the employer's reason is 'not sufficiently strong.'" *Id.* at 12 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 230 (2015)).

While Plaintiff is correct that *Young* discusses instances when an employer's stated policies can be pretextual, the rule from *Young* concerned instances when "the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden." *Young*, 575 U.S. at 229. The Court cannot find, and Plaintiff does not cite, to any instance where BayCare's inconsistent application involved placing a significant burden on pregnant workers, such as a policy where non-pregnant workers were given an accommodation but pregnant workers were not. *See id.* at 230 ("[The plaintiff] can show that [the defendant] accommodates most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting limitations.").

Additionally, *Young* states that a "plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." 575 U.S. at 229–30. But

21

*Young* is inapposite, as Plaintiff concedes there are no non-childbirth comparators in the record. *See* Dkt. 71 at 3. To the extent there was some deviation in any of the three policies, "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999) (discussing an ADEA claim). Again, Plaintiff needed to show that other comparators enjoyed the benefits of BayCare's policies, while Plaintiff did not due to the birth of her child, but she has failed to do so. *See Berg v. Florida Dep't. of Labor & Emp. Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1255 (11th Cir. 1998) ("[The plaintiff], however, failed to show that the policies at issue were ever applied to other . . . clients (although obviously they must have been), let alone applied in an inconsistent fashion. Thus, the fact that the [defendant] may have failed to follow its own policies in [the plaintiff]'s case cannot serve as the basis for an inference of intentional discrimination."). Though Ms. Patel may have felt that BayCare's application of its policies was inconsistent, the inquiry at the pretext stage "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1218 (11th Cir. 2021) (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)).

As to the Placement Coordinator being disingenuous and a pretext, the Court cannot find any support in the record on this issue. In her deposition, Plaintiff claims

22

that BayCare did not provide any open position for Patel's consideration and that she was instructed to identify an available position on her own. Dkt. 60 at 213:14-214:24. However, when confronted with the Placement Coordinator's email, Plaintiff conceded that the Placement Coordinator did offer assistance in finding employment, asked Plaintiff to schedule a time to meet "to discuss current open positions at BayCare," and provided a link where Plaintiff could schedule a time to call the Placement Coordinator. *Id.* at 215:7-218:6; *see also* Dkt. 60-13 at 2.

The undisputed email also clearly shows that the language about Plaintiff having to find an available position on her own was referring to a scenario in which Plaintiff *independently* found a position and applied for it. In such cases, the Placement Coordinator requested that Plaintiff promptly notify her so she could let the recruiter know that the application should be reviewed "ASAP" by a hiring manager. Dkt. 60-13 at 2 ("I ask that anytime you apply for a position online, to please email the posting numbers to PlacementCoordinator@baycare.org. This will prompt us to notify the recruiters ASAP and get that application reviewed by the hiring manager. I work closely with the recruiters to notify them anytime you apply to a position, so they are aware you are working with Placement Services and aware you have a limited timeframe to secure a position."). As such, the Court cannot find any genuine dispute showing that the offer of a Placement Coordinator was disingenuous or a futile endeavor. On the contrary, the record shows that it was Ms.

Patel who refused to engage with the Placement Coordinator, believing it violated "federal employment laws." *See* Dkt. 60-13 at 1–2. But again, the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs." *Todd*, 998 F.3d at 1218 (citation omitted).

Because Patel did not meet her burden in establishing that BayCare's proffered legitimate, nondiscriminatory reason for her termination was pretextual, the Court grants summary judgment as to the FMLA retaliation claim in Count III.[3]

## II.   Pregnant Workers Fairness Act Claims (Counts IV–VI)

"The PWFA's effective date of June 2023 means that caselaw interpreting it, especially at the summary judgment stage, is scant." *Trego v. Penske Logistics, LLC*, No. 3:24-CV-00460, 2026 WL 402501, at *7 (M.D. Tenn. Feb. 12, 2026) (citation omitted). The few federal courts that have considered PWFA claims have largely treated them as analogous to ADA claims. *See id.* (collecting cases); *Gelinas v. S. Dentistry*, No. CV 1:25-0004-TFM-N, 2026 WL 1181334, at *3 (S.D. Ala. Feb. 13, 2026) (treating PWFA claims as ADA claims), *report and recommendation adopted*,

---

[3] Plaintiff's response also mentions that the "convincing mosaic" framework applies to Patel's claims. Dkt. 71 at 2. The "convincing-mosaic framework" is only "a metaphor, not a legal test" and asks, "whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023). There are "three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Id.* (citation omitted). Here, Plaintiff's response merely recites the legal standard for the convincing-mosaic theory and then never cites or mentions it again in her opposition briefing. *See* Dkt. 71 at 2–3. Regardless, based on a review of the record, the Court cannot find any evidence that falls into the three categories of circumstantial evidence. Indeed, Plaintiff even admits there are no comparators in this case. *Id.* at 3.

2026 WL 738154 (S.D. Ala. Mar. 16, 2026); *Keiper v. CNN Am., Inc.*, No. 24-CV-875, 2024 WL 5119353, at *2 (E.D. Wis. Dec. 16, 2024) ("Congress intended the PWFA to expand protections for pregnant employees and modeled it largely off the Americans with Disabilities Act (ADA)."). As such, the Court will apply the ADA's standards to Plaintiff's PWFA claims.

a. *Failure to Accommodate (Count IV)*

Like the ADA, the PWFA prohibits employers from refusing to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee," unless the employer can demonstrate "that the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 2000gg-1(1). Further, it prohibits an employer from taking an "adverse action . . . against a qualified employee" because the employee requested reasonable accommodations. *Id.* § 2000gg-1(5).

"Under the PWFA, the plaintiff must state: (1) she had a medical condition related to the pregnancy; (2) she was placed on work restrictions by a medical professional; (3) she is requesting reasonable accommodations; and (4) the defendant failed to accommodate those restrictions." *Carnegie v. Heritage Park Nursing Ctr. LLC*, No. 8:25-CV-00739-CEH-AEP, 2025 WL 2697857, at *4 (M.D. Fla. Sept. 4, 2025), *report and recommendation adopted*, 2025 WL 2695234 (M.D. Fla. Sept. 22, 2025); *see also Keiper*, 2024 WL 5119353, at *2 ("To establish a prima

25

facie case for failure to accommodate under the PWFA, [the plaintiff] must allege facts sufficient to show: (1) she is a qualified individual; (2) the employer was aware of her limitation; and (3) the employer failed to reasonably accommodate the limitation.").

As an initial matter, the Court assumes that the first and second elements have been satisfied. First, Patel is likely a qualified individual since she "can perform the essential functions of the employment position," even if she was temporarily unable to do so. 42 U.S.C. § 2000gg(6)(A)–(C). Second, "the term 'known limitation' means physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or employee's representative has communicated to the employer whether or not such condition meets the definition of disability specified in . . . the [ADA][.]" 42 U.S.C. § 2000gg(4). "Communicated to the employer" includes making "the employer aware of the limitation by communicating with a supervisor, a manager, someone who has supervisory authority for the employee or who regularly directs the employee's tasks." 29 C.F.R. § 1636.3(d). On July 18, 2023, before her leave ended, Patel communicated to her employer by requesting flexible scheduling and remote work due to "dehydration, fatigue, back pain, delayed childbirth recovery, post-partum depression, . . . separation anxiety[,]" concerns about exposure to potential pathogens at the new hospital and higher amounts of "VOC and SVOC toxins off

26

gassed" getting into her breastmilk. Dkt. 60-11 at 2. As such, the Court focuses on the third element—whether BayCare discriminated against Plaintiff by failing to provide a reasonable accommodation.

On this issue, Plaintiff argues that "[a]fter . . . communicat[ing] her limitations and corresponding need for remote telework work accommodation to BayCare, her supervisor—the decisionmaker—immediately refused the accommodation recommended by Patel's physician." Dkt. 71 at 7. On the other hand, BayCare contends that "[r]emote work was not reasonable" since "to accommodate fully remote work would eliminate these essential functions for an indefinite period." Dkt. 58 at 18. For the reasons discussed below, the Court agrees with BayCare.

The PWFA explicitly incorporates the ADA's definition of "reasonable accommodation," 42 U.S.C § 2000gg(7), which defines the term as "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," along with "job restructuring, part-time or modified work schedules, reassignment to a vacant position, [and] acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9)(A)–(B). PWFA regulations similarly state that a "reasonable accommodation" includes: "[m]odifications or adjustments to a job application process"; [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed"; "[m]odifications or adjustments that enable a covered entity's employee

27

. . . to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without known limitations"; or "[t]emporary suspension of essential function(s) and/or modifications or adjustments that permit the temporary suspension of essential function(s)." 29 C.F.R. § 1636.3(h)(1)(i)–(iv).

With these regulations in mind, "[a]n accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (citation omitted). "The employee has the burden of identifying an accommodation and demonstrating that it is reasonable." *Id.* (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255–56. (11th Cir. 2001)). "Assuming she cannot do so, the employer has no affirmative duty to show undue hardship." *Id.* (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)).

Here, in the July 18, 2023, email requesting flexible scheduling and remote work, Plaintiff estimated she would need these accommodations until April 5, 2024. Dkt. 60-11. This timeframe is over a year after the birth of Plaintiff's child on March 14, 2023, and eight additional months of absence following the end of her FMLA leave on July 24, 2023. Dkt. 59 ¶¶ 43, 56, 59; Dkt. 60 at 208:22-209:4. Notably, when questioned about how she arrived at this April 2024 date, Plaintiff admitted she was only "estimating" and was "not sure" when she could actually return to work. Dkt. 60 at 208:19-209:14.

28

Similarly, when Patel's physician completed BayCare's Work Clearance Form, the doctor certified that Patel had no physical or mental impairment that limited her ability to perform the essential functions of her job, identified no physical or environmental restrictions, and did not specify a need for medical equipment or supplies. Dkt. 60-14. Yet, in the blank space for whether Patel needed an accommodation, the doctor wrote "work from home," with an "uncertain date" to when that accommodation would end. *Id.* When asked about this medical opinion in her deposition, the doctor plainly stated she was not aware whether Plaintiff's job could be done remotely and admitted that remote work would be indefinite until Plaintiff's postpartum depression or anxiety finally resolved. Dkt. 62 at 68:13-23 ("Q. Is it fair to say that based on that note, you were not aware at this time whether or not her job was something that could be performed from home, but if it was, you thought that she could do it from home -- she could work from home? A. Correct. Q. And it notes, 'Restrictions effective until uncertain date.' Is that right? A. Correct. Probably until her postpartum depression or anxiety would be relieved or whatever, however you say it, resolved.").

Plaintiff's requested accommodation for extended remote work was unreasonable. *See Frazier-White*, 818 F.3d at 1256 ("Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law."). "The ADA covers people who can perform the essential functions of their jobs presently

29

or in the immediate future," *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003), and the PWFA regulations follows a similar path by defining the "temporary period" of being unable to perform an essential function as "lasting for a limited time, not permanent, and may extend beyond 'in the near future.'" 29 C.F.R. § 1636.3(f)(2)(i). For an active pregnancy, "in the near future" is further defined as being able to perform an essential function "within generally 40 weeks of its suspension." *Id.* § 1636.3(f)(2)(ii). But Plaintiff's return date of April 5, 2024—that was admittedly only an estimation—was over a year *after* giving birth, well past the 40 weeks (i.e., the length of a full-term pregnancy) listed in the PWFA's regulations as being "in the near future." *See also Frazier-White*, 818 F.3d at 1256 (noting the plaintiff "later admitted at the due process hearing that she did not know how much time she needed or whether any amount of time would be sufficient").

Worse still, Plaintiff's physician could not even provide a firm end date, *see* Dkt. 60-14, only guessing the indefinite accommodation would end when Plaintiff's "postpartum depression or anxiety . . . resolved." Dkt. 62 at 68:19-23; *see Monroe v. Florida Dep't of Corr.*, 793 F. App'x 924, 927 (11th Cir. 2019) ("[The plaintiff's] doctor did not give, and could not have given, a date when [the plaintiff] could return to work. Our case law is clear that indefinite leave is not a reasonable accommodation and that it was [the plaintiff's] duty to identify such an accommodation."). In short, the request for extended remote work was not

30

reasonable. While the PWFA regulations do list temporary "telework" and "remote work" as examples of a reasonable accommodation, 29 C.F.R. § 1636.3(i)(2), the PWFA does not require BayCare to grant Plaintiff an extended remote work accommodation until she could finally return to the Hospital "at some uncertain point in the future." *Wood*, 323 F.3d at 1314; *see* 29 C.F.R. § 1636.3(h)(1)(iv) (noting reasonable accommodations are only "[t]emporary suspension of essential function(s)"); 29 C.F.R. § 1636.3(f)(2)(i) (defining "temporary" suspension of essential functions).

Additionally, Patel's failure to accommodate claim fails because she caused the breakdown of the interactive process. As mentioned above, the PWFA incorporates some of the ADA's definitions. *See* 42 U.S.C § 2000gg(7) (incorporating the ADA definition of "reasonable accommodation," including "the interactive process that will typically be used to determine an appropriate reasonable accommodation"); 42 U.S.C. § 2000gg-1(2) (requiring accommodation arrived at through the interactive process referred to in section 2000gg(7)). During this process, "the employer 'initiate[s] an informal, interactive process' with the employee to discuss the employee's specific limitations, explore potential accommodations, and select the most appropriate accommodation for both the employer and the employee." *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022) (citing to ADA regulations). Similarly, the

31

PWFA regulations state the "[i]nteractive process means an informal, interactive process between the covered entity and the employee seeking an accommodation under the PWFA." 29 C.F.R. § 1636.3(k). "Therefore, when an employee triggers an employer's accommodation duties, the employer must expend time and expense to explore the universe of reasonable accommodations, identify one that is mutually agreeable to the parties, and implement it." *Owens*, 52 F.4th at 1335. However, "liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)).

Here, before and after the August 3, 2023, interactive process meeting, BayCare sent at least 11 communications seeking workable accommodations for Plaintiff. *See* Dkt. 60-13; Dkt. 60-16; Dkt. 60-17; Dkt. 60-20; Dkt. 60-22; Dkt. 60-23; Dkt. 60-25; Dkt. 60-27; Dkt. 60-29; Dkt. 60-31; Dkt. 60-33. During the August 3, 2023, interactive process meeting, it is undisputed that the parties mutually agreed to some of Plaintiff's requested accommodations, *see* Dkt. 60-21 (showing Plaintiff's suggested accommodations), including pump breaks, bathroom breaks, flexible scheduling for medical and therapy appointments, and the ability to bring and drink her own water throughout the workday—all of which are listed in PWFA regulations as not "impos[ing] an undue hardship under the PWFA when they are

32

requested as workplace accommodations." 29 C.F.R. § 1636.3(j)(4); *see* Dkt. 60-22 at 1; Dkt. 60-27 at 1; Dkt. 60-29 at 2; Dkt. 73-11. There is also no dispute that BayCare offered Plaintiff a Placement Coordinator to assist with identifying a remote or alternative in-person position to accommodate her other needs. Dkt. 60-13 at 2 (showing email from BayCare's Placement Coordinator); *see* 29 C.F.R. § 1636.3(i)(2) (listing "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position" as examples of a reasonable accommodation); 29 C.F.R. § 1636.3(f)(2)(iii) ("[T]he employee performing the functions of a different job to which the covered entity temporarily transfers or assigns the employee.").

Nevertheless, Plaintiff declined every option. *See* Dkt. 60-26; Dkt. 60-28; Dkt. 60-30. At the August 3, 2023, interactive process meeting, Plaintiff suggested various accommodations in order to return to in-person work, including a reverse osmosis water filtration system, an IQ Air HealthPro Plus GC air filtration in all areas of the Hospital, a closed-door private office with UV and HyperHEPA filtration systems, and monthly third-party inspections of all equipment. *See* Dkt. 60-21; Dkt. 60 at 244:6-245:16 ("Q. If you had all of these accommodations or only some of them? A. Preferably all of them, you know. These are really what would have made me feel comfortable to return."). But it is undisputed that no physician recommended such accommodations, and Plaintiff herself could not explain what many of the listed items were or how much they would cost BayCare. Dkt. 60 at

33

246:21-250:1; *see also Stewart*, 117 F.3d at 1286 (noting "a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation" (citation modified)). Critically, none of these suggested accommodations from Plaintiff's list are mentioned or even relate to the PWFA's examples. *See* 29 C.F.R. § 1636.3(i).

Following the impasse at the August 3, 2023, interactive process meeting, BayCare requested supporting documentation to help determine if Plaintiff's list of suggested accommodations was reasonable in light of any medical conditions, as permitted under the PWFA regulations. *See* 29 C.F.R. § 1636.3(l)(1) ("A covered entity may seek supporting documentation from an employee who requests an accommodation under the PWFA only when it is reasonable under the circumstances . . . to determine whether the employee has a physical or mental condition related to, affected by, or arising out of . . . childbirth[.]"). Plaintiff never provided the medical questionnaire to her doctor and never authorized BayCare to contact the physician directly. Dkt. 60 at 251:10-252:18; Dkt. 62 at 68:24-69:15; *see* Dkt. 60-22 at 5, 13–25 (showing the medical questionnaire); Dkt. 60-29 at 3 (showing BayCare's emails asking Plaintiff to provide the questionnaire to her doctor); Dkt. 60-31 at 2 (showing BayCare's email following up on whether the medical questionnaire was provided to her doctor). Instead, Plaintiff repeatedly claimed that the questionnaire violated

34

the PWFA and demanded that BayCare allow her to work remotely while she waited for an appointment with her OB-GYN. *See* Dkt. 60-30 at 5.

As to the Placement Coordinator, the record is clear that Plaintiff flatly declined the coordinator's services, and even claimed contacting her was an "intentional violation of applicable federal employment laws." *See* Dkt. 60-13 at 1; Dkt. 60 at 216:6-218:6 (being questioned on why Plaintiff declined the Placement Coordinator's assistance). But the Placement Coordinator is not in violation of the PWFA; on the contrary, the applicable regulations even list "[j]ob restructuring" and "reassignment to a vacant position" as reasonable accommodations. 29 C.F.R. § 1636.3(i)(2); *see also id.* § 1636.3(f)(2)(iii) ("The inability to perform the essential function(s) can be reasonably accommodated. . . . by temporary suspension of the essential function(s) . . . including . . . the employee performing the functions of a different job to which the covered entity temporarily transfers or assigns the employee[.]").

Even when construing the evidence in the light most favorable to Plaintiff, any failure in the interactive process must be attributed to the Plaintiff because she rejected BayCare's various reasonable accommodations, and her demand for extended remote work was unreasonable. *See Frazier-White*, 818 F.3d at 1257 ("Defendant tried to initiate such a process . . . Plaintiff's only response was to request an indefinite extension of her light-duty status, an unreasonable

35

accommodation as a matter of law. Any failure in the interactive process must therefore be attributed to Plaintiff."). Because the PWFA and analogous ADA principles hold that an employer cannot be held liable where the employee's own intractability causes the breakdown, *Stewart*, 117 F.3d at 1287, the Court finds that BayCare is entitled to summary judgment on Count IV.

      *b. PWFA Retaliation—Counts V*

The PWFA's anti-retaliation provision contains two distinct prohibitions. *See* 42 U.S.C. § 2000gg-2(f). First, no person shall "discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter or because such employee made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Id.* § 2000gg-2(f)(1). Second, the PWFA prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of any right granted or protected by the statute. *Id.* § 2000gg-2(f)(2).

Beginning with the retaliation claim, federal courts usually evaluate retaliatory-discharge claims under the same burden-shifting framework used to assess Title VII retaliation claims. *See Todd*, 998 F.3d at 1219 (collecting cases showing Title VII retaliation standard applies to FMLA, ADA, and Rehabilitation Act retaliation claims). The same standard will apply to PWFA retaliation claims,

36

since the PWFA's retaliation provision mirrors the ADA's provision.[4] As such, the Court applies the previously articulated retaliation standard that requires a plaintiff to establish: "(1) she participated in conduct that the statute protects; (2) she suffered an adverse employment action; and (3) the protected conduct and the adverse employment action are causally related." *Id*. If the plaintiff sets forth a prima facie case, "the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the employment decision." *Id*. (citation omitted). "If the employer carries that burden, then the plaintiff bears the ultimate burden to show that the proffered nondiscriminatory reasons 'are a pretextual ruse designed to mask retaliation.'" *Id.* (quoting *Stewart*, 117 F.3d at 1287).

Here, the Court's evaluation of this count is functionally the same as its prior analysis of the FMLA retaliation claim in Count III. Assuming Plaintiff has met the prima facie elements by "requesting . . . a reasonable accommodation to the known limitations related to . . . childbirth," 42 U.S.C. § 2000gg-1, during the August 2023 meeting and then got terminated shortly thereafter on September 22, 2023,[5] Plaintiff has still not demonstrated that BayCare's legitimate, nondiscriminatory reason for

---

[4] *Compare* 42 U.S.C. § 2000gg-2(f)(1) ("No person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter or because such employee made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."), *with* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.").

[5] To the extent Plaintiff claims that this close temporal proximity between the accommodations request and termination is evidence of pretext, the Eleventh Circuit has already rejected this argument. *See Todd*, 998 F.3d at 1219–20 ("[T]emporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020))).

37

her termination was a pretext for retaliation. Incorporating by reference the Court's prior analysis, BayCare pointed to several nondiscriminatory reasons. These include Plaintiff's extended absence from work, declining to participate in the interactive process, and refusing to provide supporting documentation to her medical provider. Dkt. 58 at 10. Plaintiff's two arguments about the "inconsistent application of BayCare's accommodation policies," and the Placement Coordinator being "disingenuous and [a] pretext for her termination," still fail to satisfy her burden to show that the proffered nondiscriminatory reasons were pretextual. Dkt. 71 at 8, 18.

While not argued by Plaintiff, upon the Court's own review of the record, there is a statement from the August 3, 2023, meeting in which Redfern allegedly told Patel, "You cannot return to your original position because you requested accommodations." Dkt. 71-2 ¶¶ 96, 101, 144. However, no reasonable jury could infer that, based on this statement, BayCare used the interactive process as a pretext to retaliate against Patel for exercising her PWFA rights. Redfern's comment was made in reference to Patel's laundry list of in-person accommodations—i.e., requesting a reverse osmosis water filter system, monthly water testing, IQ Air HealthPro Plus GC air filtration in all areas of the Hospital, a closed-door private office with UV and HyperHEPA filtration systems, monthly testing of all air filtration equipment, and a massage chair—that BayCare said it could not provide because it would be an undue burden. *See* Dkt. 60-21; Dkt. 60 at 246:6-248:18 ("Q.

38

Okay. But you understand that . . . was because there was an undue burden and they could not accommodate you. That was the position of BayCare. A. Unfortunately, yeah. And we asked what the undue burden was and they were unable to tell us that as well. Q. Who was unable to tell you? A. In the interactive process, I did not find out why, what was the undue burden. Q. Well, I think the document will speak for itself, but okay.").

Moreover, as discussed above, it is undisputed that BayCare did allow Patel to return to her original position with accommodations due to her childbirth, including pump breaks, additional bathroom breaks, flexible scheduling for doctor and therapy appointments, and the ability to bring and drink her own water. Dkt. 59 ¶ 101; Dkt. 60-22 at 1; Dkt. 60-29 at 2; Dkt. 73-11. Again, all of these are accommodations that BayCare agreed to during the August 3, 2023, interactive process meeting, *see* Dkt. 60-22 at 1; Dkt. 60-27 at 1, and the PWFA explicitly approves of them as not constituting an undue burden on the employer. *See* 29 C.F.R. § 1636.3(i)(4); *id.* § 1636.3(j)(4)(i)–(iv). For the above reasons, Plaintiff's arguments do not carry her burden of establishing that BayCare's proffered reasons for ending her employment were a pretext for retaliation. The Court grants summary judgment on the PWFA retaliation claim in Count V.

39

#### c. *PWFA Interference—Count VI*

Turning to Plaintiff's PWFA interference claim, the statute prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of any right granted or protected by the statute. 42 U.S.C. § 2000gg-2(f)(2). Because this language is almost identical to the ADA's prohibition on interference, the Court will apply the ADA's standard to this count. *See* 42 U.S.C. § 12203(b). It appears the Eleventh Circuit has "not yet had occasion to explain the proper standard for evaluating an ADA anti-interference claim." *Atchison v. Bd. of Regents of Univ. Sys. of Georgia*, 802 F. App'x 495, 508 (11th Cir. 2020).

However, district courts within this circuit has found that an ADA interference claim requires a plaintiff must show: "(1) he exercised a right protected by the ADA; (2) the defendant coerced, intimidated, threatened, and/or interfered with plaintiff's exercise or enjoyment of that right; and (3) the defendant's actions were motivated because the plaintiff exercised a right protected by the ADA." *Collins v. Dekalb Cnty., GA*, No. 1:24-CV-01252-LMM, 2026 WL 623676, at *20 (N.D. Ga. Feb. 27, 2026) (collecting district court cases). "Persuasive authority also supports that the ADA's anti-interference provision prohibits only 'discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her ADA rights.'" *Schwarcz v. Walt Disney Parks & Resorts U.S., Inc.*, No. 6:25-CV-640-JSS-RMN, 2026 WL 864829, at *7 (M.D. Fla.

40

Mar. 30, 2026) (quoting *Mosley v. AM/NS Calvert, LLC*, No. CV 1:20-00517-KD-M, 2022 WL 843773, at *9 (S.D. Ala. Mar. 21, 2022)).

Here, the PWFA interference claim fails because no reasonable jury could find that BayCare's conduct was so "severe or pervasive" that it coerced, intimidated, threatened, or interfered with Patel's exercise of her PWFA rights. To the contrary, as the Court has extensively discussed above, BayCare proactively engaged in an interactive process despite Patel's failure to request a legally cognizable accommodation.

Additionally, almost all interactions between BayCare and Plaintiff occurred via email, *see, e.g.*, Dkts. 60-28, 60-30, 60-31, 60-34, which look nothing like other ADA interference cases in which summary judgment was denied. *See Schwarcz*, 2026 WL 864829, at *8 (denying summary judgment on ADA interference claim where the defendant refused to adjust the air conditioner in the plaintiff's hotel room, told the plaintiff she was free to leave the hotel and never return, directed its resort employees to follow the plaintiff and monitor her, denied her access to restaurants and other areas in the resort, and trespassed her from the defendant's properties); *Brown v. State Farm Mut. Auto. Ins. Co.*, 770 F. Supp. 3d 1355, 1370 (N.D. Ga. 2025) (denying summary judgment on an ADA interference claim because the defendant was overly scrutinizing the plaintiff's restroom breaks and "once followed [the] [p]laintiff to the restroom while timing her"). On the other hand, the

41

email communications between the parties fail "to meet the level of severity that would cause a reasonable person to abandon her ADA rights (*i.e.*, such that would be reasonably likely to interfere with the exercise or enjoyment of ADA rights)." *Mosley*, 2022 WL 843773, at *9. Indeed, Plaintiff did not abandon any rights, as she continued to demand accommodations from Defendant and threatened to file a discrimination charge. *See, e.g.*, Dkt. 60-28; Dkt. 60-30 at 7; Dkt. 60-31 at 1; Dkt. 60-34 at 2. Because the record reveals insufficient evidence that BayCare interfered with Plaintiff's exercise or enjoyment of her PWFA rights, the Court grants summary judgment on Count VI.

## III.   Pregnancy Discrimination Act Claims (Counts VII–X)

The PDA amended Title VII to provide that discrimination "because of sex" or "on the basis of sex" includes discrimination on the basis of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). As such, the Court will apply Title VII's standards to these PDA claims, including the *McDonnell Douglas* burden shifting framework. *See Young*, 575 U.S. at 212.

### a.  *PDA Failure to Accommodate and Discrimination claims (Counts VII and X)*[6]

To establish a PDA discrimination claim based on disparate treatment, a plaintiff must show that: "(1) she is a member of the protected class; (2) she

---

[6] The Court characterizes these counts as disparate treatment claims because Counts VII and X of the Amended Complaint state "BayCare treated Patel differently from, and less preferably than, other employees by not uniformly applying its workplace policies." Dkt. 32 ¶¶ 93, 112.

requested accommodation; (3) the employer refused her request; and (4) the employer nonetheless accommodated others 'similar in their ability or inability to work.'" *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1285 (11th Cir. 2020) (quoting *Young*, 575 U.S. at 229).

"After a plaintiff satisfies her *prima facie* burden, the employer may come forward with 'legitimate, nondiscriminatory reasons' for denying the plaintiff's requested accommodation." *Id.* (quoting *Young*, 575 U.S. at 229). "[A]n employer cannot simply say that it is more expensive or less convenient to add pregnant women to the category of those (similar in their ability or inability to work) whom the employer accommodates, since that reason alone would generally be inconsistent with the [PDA's] basic objective." *Id.* (citation modified).

Once the nondiscriminatory reason is provided, the burden shifts back to the plaintiff "to demonstrate that the employer's stated reason is 'in fact pretextual.'" *Id.* (quoting *Young*, 575 U.S. at 229). The plaintiff can "survive summary judgment if she shows both that the employer's policies impose a significant burden on pregnant workers and that the employer's legitimate, nondiscriminatory reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination." *Id.* (citation modified).

As an initial matter, the parties do not dispute that Plaintiff satisfies the first three prongs of the prima facie test. As a woman who gave birth, Patel was obviously part of the class protected by the PDA. *See* 42 U.S.C. § 2000e(k) ("The term[ ] 'because of sex' . . . include[s] . . . because of or on the basis of . . . childbirth[.]"). And Plaintiff sought an accommodation from BayCare, requesting flexible scheduling and remote work. *See* Dkt. 60-11 at 2. As to the third prong, Plaintiff established that BayCare declined to allow remote work for an additional eight months. Dkt. 60-16; Dkt. 60-22. As such, the Court focuses on the fourth prong— whether BayCare accommodated others who had not given birth but were "similar in their ability or inability to work." *Young*, 575 U.S. at 229. On this prong, the Eleventh Circuit has explained, "in contrast to Title VII's more general comparator analysis, 'the comparator analysis under the PDA focuses on a single criterion— one's ability to do the job.'" *Durham*, 955 F.3d at 1286 (quoting *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1228 n.14 (11th Cir. 2019)).

Here, Plaintiff has failed to satisfy the fourth prong, as there is nothing in the record showing that BayCare accommodated workers who had not recently given birth but were "similar in their ability or inability to work." As previously discussed, Plaintiff concedes there is no evidence of a similarly situated comparator. Dkt. 71 at 3. Thus, Plaintiff's PDA accommodation and discrimination claims cannot survive summary judgment.

Plaintiff, however, attempts to get around this fatal issue by arguing "[w]ith BayCare's policies concerning accommodations for pregnant and non-pregnant employees, the probative value of a similarly situated comparator is unnecessary." *Id.* There are two problems with this meritless argument. First, this statement directly conflicts with binding precedent holding that Plaintiff must identify any (non-childbirth) colleague who was equally unable to perform the duties of an executive assistant but was still provided with an accommodation. *See Durham*, 955 F.3d at 1286; *Young*, 575 U.S. at 229. Second, *Young* explicitly found that an employer's application of its policies requires the plaintiff to identify comparators, explaining "the plaintiff may reach a jury . . . by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather . . . give rise to an inference of intentional discrimination." *Young*, 575 U.S. at 229. In other words, even if Plaintiff established a prima facie case of discrimination under *Young*, she would still need to disprove BayCare's nondiscriminatory reasons by pointing to evidence showing BayCare's policies accommodated non-childbirth employees with remote work while failing to accommodate Plaintiff with remote work. Again, such evidence would require Plaintiff to point to comparators who benefited from BayCare's policies, which she has totally failed to do.

45

As the Court discussed in Count III, the record is devoid of instances in which BayCare's inconsistent application of its policies placed a significant burden on workers who had given birth, such as a policy that gave non-childbirth workers an accommodation but not workers who had given birth. *See Young*, 575 U.S. at 230 ("[The plaintiff] can show that [the defendant] accommodates most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting limitations."). In sum, Patel cannot establish her prima facie case because she identified no other employee with similar responsibilities who was permitted to work remotely or forego their essential in-person duties. The Court grants summary judgment on Counts VII and X.

   b. *PDA Relation Claim—Count VIII*

Title VII prohibits retaliation against employees for engaging in protected conduct, including filing a charge of discrimination under Title VII and opposing practices made unlawful by Title VII. 42 U.S.C. §§ 2000e-3(a). For the sake of brevity, the Court does not reiterate the Title VII retaliation standard that it has previously outlined in prior counts.

Here, the Court incorporates by reference its prior analysis on the retaliatory-termination claims in Counts III and V. Again, Plaintiff "bears the burden to show that the employer's reasons are pretextual, which merges with the ultimate burden of establishing a genuine triable issue of retaliatory intent." *Thibodeaux v. City of*

46

*Atlanta, Georgia*, No. 24-12921, 2025 WL 2505600, at *3 (11th Cir. Sept. 2, 2025).

For the reasons discussed above, assuming Plaintiff establishes a prima facie case,

the Court still finds that Plaintiff has failed to satisfy its burden to show BayCare's

reasons for terminating her were pretextual. Plaintiff's arguments to the contrary,

*see* Dkt. 71 at 8, 18, are nothing more than conclusory allegations of discrimination

or retaliation, which are insufficient to carry Plaintiff's burden. *See Mayfield v.*

*Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). The Court grants the

motion for summary judgment on Count VIII.

c. *PDA Retaliatory Hostile Work Environment—Count IX*

Plaintiff's retaliatory-hostile-work-environment claim fares no better. "Title

VII prohibits the creation of a hostile work environment in retaliation for an

employee's engagement in protected activity." *Tonkyro v. Sec'y, Dep't of Veterans*

*Affs.*, 995 F.3d 828, 835 (11th Cir. 2021) (citation omitted). "A retaliatory-hostile-

work-environment claim complains that the employer created or tolerated a hostile

work environment in retaliation for an employee's participation in protected activity

under Title VII." *Buckley v. Sec'y of Army*, 97 F.4th 784, 799 (11th Cir. 2024).

"[R]etaliatory hostile work environment claims, like retaliation claims based on

discrete acts, prevail if the conduct complained of well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Tonkyro*,

995 F.3d at 836 (citation modified). As such, a plaintiff must show that (1) she

47

engaged in protected activity; (2) she suffered a hostile work environment because of that activity; and (3) the work environment "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Terrell v. Sec'y, Dep't of Veterans Affairs*, 98 F.4th 1343, 1356 (11th Cir. 2024) (quoting *Monaghan v. Worldpay U.S., Inc.*, 955 F.3d 855, 862–63 (11th Cir. 2020)).

Importantly, "[t]he standards for judging hostility are intended to be sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* (citation modified). "The Supreme Court has emphasized that 'a plaintiff must show that a reasonable employee would have found the challenged action *materially* adverse,' separating 'significant from trivial harms' such as 'petty slights, minor annoyances, and simple lack of good manners.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Here, assuming the first two elements are met, Plaintiff cannot meet her burden of showing that any resulting hostility "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Monaghan*, 955 F.3d at 863. Plaintiff claims the hostile work environment stemmed from being "instructed to find a non-existent alternative position, demanded to appear in-person to discuss accommodations, and . . . terminated." Dkt. 71 at 2; *see also id.* at 10 ("The complaints are a basis for . . . a hostile work environment claim against BayCare because of the scrutiny of her motives seeking accommodation and

48

having to unilaterally secure an alternate job with BayCare."). But no reasonable jury could find that any of these things would dissuade a reasonable worker from making or supporting a charge of discrimination.

First, there is no dispute that the August 3, 2023, interactive process meeting was held virtually. Dkt. 59 ¶ 80; Dkt. 71-2 ¶ 80. Indeed, Plaintiff preferred that the meeting be held virtually, and the record shows that BayCare complied with that preference. Dkt. 59 ¶ 79; Dkt. 71-2 ¶ 79. Nor did BayCare ever demand that Plaintiff come in person. *See* Dkt. 60-17 at 1 (showing email where Redfearn states that she "look[s] forward to our teams call [on August 3, 2023]. If you would prefer to meet in person, we can also work to support this preference"); Dkt. 60-20 at 2 (providing Plaintiff with dates to meet in-person or keep the virtual meeting on August 3, 2023). Put simply, the scheduling emails for the August 3, 2023, meeting between BayCare and Patel contain no evidence of hostility that would dissuade a reasonable worker from filing a discrimination charge.

Second, as to the Placement Coordinator being evidence of a retaliatory hostile work environment, the Court cannot find any support for such an argument. As discussed above, Plaintiff's deposition initially claimed that BayCare did not provide any open position for Patel's consideration and forced her to find a position on her own. Dkt. 60 at 213:14-214:24. However, when provided with the Placement Coordinator's email, Plaintiff admitted that the Placement Coordinator offered

assistance in finding employment within BayCare, asked Plaintiff to schedule a time to meet "to discuss current open positions at BayCare," and provided a link where Plaintiff could schedule a time to call the Placement Coordinator. *Id.* at 215:7-218:6; *see also* Dkt. 60-13 at 2. In short, the Placement Coordinator's email shows that Plaintiff never had to find an available position on her own. Instead, if Plaintiff independently found a position and applied for it, the Placement Coordinator requested that Plaintiff promptly notify BayCare so the application could be reviewed "ASAP" by a hiring manager. Dkt. 60-13 at 2. The Court is unsure how this accommodation from BayCare creates a genuine dispute about whether a reasonable worker would be dissuaded from exercising their rights. Nor does Plaintiff's response provide or cite to any authority showing that an accommodation from an employer can dissuade a reasonable worker from making a charge of discrimination.

In sum, the conduct Plaintiff identifies does not even reach the level of "petty slights, minor annoyances, and simple lack of good manners," much less reach a level that can dissuade a reasonable worker from making or supporting a charge of discrimination. *Terrell*, 98 F.4th at 1356. Therefore, the Court finds that summary judgment is due to be granted on Count IX.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant BayCare's Motion for Summary Judgment, Dkt. 58, is **GRANTED** as to all pending counts.

2. The Clerk is directed to **ENTER** final judgment in favor of Defendant BayCare Health System, Inc. and against Plaintiff Pamela Patel on Counts II, III, IV, V, VI, VII, VIII, IX, and X of the Amended Complaint.

3. The Clerk is also directed to **TERMINATE** all deadlines and **CLOSE** this case.

   **DONE AND ORDERED** in Tampa, Florida, on May 27, 2026.

/s/ William F. Jung_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record